May it please the Court, my name is Alan Kindred and I appear for the appellate, Concord Farms, Inc. Our case today is governed by the decision of this Court in American Circuit Breaker, which held that on the facts that we're dealing with in this case, there is no trademark infringement. Our case is also supported by the recent decision of the United States Supreme Court in the Kurtzine case, which adopted the doctrine of foreign exhaustion of rights. I don't see how the Kurtzine case actually applies in the trademark context. I mean, that was a case that was in the copyright area and involved an interpretation of a very specific statutory provision, the first sale provision. So I don't really see how it applies here. Well, largely what Your Honor says is true. It was a copyright case and it was interpretation of specific language in the Copyright Act. But in reaching its decision, the Supreme Court quoted a passage from Lord Cook that dealt with trade in goods. And trade in goods is essentially also a trademark matter. So we would say that implicitly the result of the Kurtzine case would also apply in this case because it involves the dealing in legitimate goods that were purchased in a foreign country. Do you really think my talk speaks to us today? Yes, I do, Your Honor, through Justice Breyer in the Kurtzine case. It's very hard to put down old common law, but that's at least the way we see it, Your Honors. And essentially at least the rationale of American Circuit Breaker applies because we were dealing in genuine goods. The other party has formally admitted on the record that the goods that we imported into the United States were genuine goods. No, they were genuine Okudo mushrooms, not that they were genuine goods in the legal sense of the term, within the legal meaning of the term. Well, the admission made was that if the mushrooms were produced by Okudo Japan, then they're genuine. All right, I guess I have a disagreement on that interpretation as well. Counsel, do you dispute or disagree that an organically grown mushroom or an organically grown good is materially different than a good that is not organically grown? Well, Judge McGeer, there's nothing on the record from any expert here that says that in the case of mushrooms specifically, organic is any better than non-organic. So the answer to my question is you don't think there's a material difference? That's correct, Your Honor. But isn't the question whether the consumer thinks there is? Well, when we're talking about trademarks, yes, the focus on the consumer is extremely important, Your Honor, but in this case, on the packaging of the Hokuto Kinuko mushrooms, it's very, very clearly marked that the mushrooms are organic. There is no such marking on the imported mushrooms, but what we wanted to get back to was that Hokuto Kinuko also imported the non-organic Japanese mushrooms, and they said they've admitted they've done that, and they said they would do it again if it arose. What's your claim as to how much they did that? I'm sorry, Your Honor? How much did they do it? How much? Oh, how many times did they do it? Yeah, yeah. The quantity. Was it a very high quantity, Your Honor? No, not a high quantity. Right. And you're going to say that invalidates the trademark? We say, yeah, under American Circuit Breaker, it turns it into non-infringement, Your Honor, yes. That's our position. Hmm. Certainly for those particular imports, but it's hard to extend it beyond that. Well, we're only dealing in imported mushrooms. I know, but no. For the two boxes or whatever that were imported, of course you can't distinguish them, but for the rest, if there are differences, you can distinguish them. Well, yes, there are differences between the domestically... I mean, it's hard for me to see how they're doing it a couple of times invalidates their trademark on their U.S. domestic product. Well, if that doesn't invalidate the trademark, then there are other things that do. Tell us. Firstly, there was a naked license granted by Hokuto Japan, which if there's a naked license, it invalidates the trademarks of forfeit. Explain to me your theory of how there was a naked license. Well, Judge Waterlaw, first of all, there was no consideration for that document, and then secondly, there was no quality control. Neither in the document nor on the record of this case. So, therefore, it was a naked license, and the rights are forfeited. Well, but being in the... It's not dispositive that it's not necessarily have to be a provision in the document. Do you agree with that? I do agree with that. Okay, so then we look at the quality control, and if you look at what Hokuto Kanoko did, it appears that they maintained rather strict quality standards, but I'd like to hear what your position is. But including regulating the temperature, humidity, and other growing conditions, it looks like they conducted various measurements throughout the production process. They used reverse osmosis water to ensure privity. They presented evidence related to its quality control standards and procedures for shipments of the organic mushrooms from Japan. Those are just some, so where do you say there was no quality control? Well, we say the quality control has to come from the trademark owner to the purported licensee. In this case, it was going the other way, and there's no evidence on this record that Hokuto Japan was imposing or policing quality control on its subsidiary, because even when this case was filed, Hokuto Japan owned the United States trademark registrations. So the quality control had to come from Japan, not go from the United States in the other direction. Because the quality control, while it doesn't expressly have to be in the document, it still has to be done. It has to be policed, whether it's in the document or not, and on this record there's no evidence that that ever happened coming from Japan. And you're saying, because I want to make sure I understand your argument, that the Japan company had to be the one to ensure the quality control. Yes, Judge McGee, yes. The fact that the American company or subsidiary did it is of no moment or relative. It could do a better job, indeed. And your authority for it being, when you have this kind of situation where you have a subsidiary and you have the owner in Japan, what is the authority for that that you're saying? Because I thought we just looked at the quality control. You're saying we have to look for whom it's coming from. And so what's the authority for that? Well, they just, you know, in the facts of every case I've read where there's been discussion of quality control, it has come from the trademark owner. It is the trademark owner's responsibility toward a licensee that it police the quality control. Otherwise, it runs the risk of forfeiting its trademarks. Let me ask you if I can, because you also assert another basis,  Yes. I want to know what evidence, other than the acknowledged misrepresentation of fact, do you have that there was an intention to deceive the trademark office? Well, we have, in this case, we've got 20, around 20 false statements that were made under oath to the trademark office by the brave attorney who signed these applications. And we have an admission on the part of the Hocto companies that they never had any intention of using the marks on all of those goods. And if you admit that you had no intention of using the mark on all of the goods, yet there are in each application two statements under oath that you do have that intention, that is grounds for cancellation of the registration. Or if it's not fraud being sufficient for cancellation, then it's unclean hands sufficient for the court not to enforce the trademarks as a matter of equity. And otherwise, if the court doesn't see it that way, this case could become what we would call the attorney's license to lie case, where if ever an attorney, or anybody else for that matter, is called out for signing a false declaration, many times they could cite to this case and say, well, the Ninth Circuit says you can get away with signing a false declaration. We think that would be a very, a decision to say that what was done by the attorney in this case doesn't matter, is going to support bad practice and give people a way out of signing a declaration that is admittedly false. You're saying that the client should be held accountable for every statement a lawyer makes in the registration. In this case, yes, we do, Your Honor. Otherwise, you know, in most cases, it's the regulations require that the person signing the declarations in the applications  So it then becomes a duty. If an attorney is brave enough, as I said, to sign a trademark application, to sign responses to office actions under oath, then they definitely need to have firsthand knowledge of the facts, which means asking the client. On this record, the attorney testified at his deposition that he didn't make any inquiry like that. He just relied on a Japanese trademark attorney who apparently wasn't licensed to practice law in the United States. And we say that's not sufficient. If the attorney is going to be brave enough to sign these documents and have to be a person with firsthand knowledge of the facts, he has to make that inquiry. And that didn't happen in this case. So we end up with around 20 false statements on the record of the Patent and Trademark Office to get these registrations. Well, I guess I gather that the district court found that it was a mistake. There wasn't an intent to deceive the PTO. Well, our response to that, Your Honor, is that the district court made too light of the fact that there were statements made to the Patent and Trademark Office under oath that were admittedly false. We believe the district court made too light of that and that this court shouldn't be setting a precedent to say attorneys can do that. So essentially, they're my arguments, Your Honors. Unless there are any other questions, I'd like to reserve the rest of my time for rebuttal. All right. You may. Thank you, Your Honor. Thank you. Good morning, Your Honors. I'm David Dillard from Christie, Parkland & Hale on behalf of Hokuto Kinuko and Hokuto Corporation of Japan. I'd like to begin by addressing the American circuit breaker case. That was a case that is easily distinguishable in the facts because in that case, the parties stipulated that as between the imported black circuit breakers and the plaintiff's gray circuit breakers, there were no material differences. And in fact, they stipulated that they were genuine goods in the U.S. On that basis, the question became, do the trademark laws apply? So what is the material difference between the Concord product and the Hokuto Company product that was sold, imported by Hokuto Kinuko for the time period in 2010? In 2010, there were some white beach mushrooms that, due to the inability to meet the demand, were imported from Japan. They were in the regular Hokuto Japan packages, but they had a label affixed to them, which is a copy of it. In our brief, it included the fact that it was a product of Japan, that the U.S. distributor was Hokuto Kinuko, an address from which a consumer could contact. I guess the label would inform the consumer of the source. Yes. Additionally, there would be differences in transport between Japan and the U.S. These are edible goods, so you need to have them refrigerated at certain temperatures and so forth. So without being able to identify exactly what those differences were, there would have been differences in the shelf life or the way in which these products were maintained during shipping. Well, the fact that some of the sales, I guess, that occurred during this time period were not substantially different, how does that affect you? I think there's a case out of the Federal Circuit that says it has to be, everything has to be, or to establish the gray market trademark infringement, you must establish that all of its sales are materially different. All right. If the goods are identical, then you get into this scenario, as in the American Tricker Breaker case, where the question is, does the trademark laws even apply? But if there are material differences, then you go into the regular likelihood of confusion analysis. And here, except for this, well, and even as to this small shipment during 2010, there was a labeling difference that would allow a consumer to understand that these were being distributed by Hokuto Kinoko. All the other products had differences in growing conditions, in packaging, the content of the information on the packages, quality control, and warranty and customer support. All of those would be differences. And except for those packages, all the packaging was, for example, in English. Even those that were imported from Japan before the Hokuto Kinoko facility down in San Marcos got up and running. So you're saying substantially all were materially different. Yes. Okay. And I would even argue that the difference in labeling as to those packages was a material difference. Okay. I'd like to get some sense of the size of the business. In the last year that you have figures for, what's the dollar value of the domestic mushrooms that Hokuto sold? I believe, and this is not in our papers. No, I know it. I believe it's in the single-digit to double-digit millions. It's pretty substantial. What does single-digit mean? Oh, a high eight or nine. And it could be a – I honestly don't know. Eight or nine what? One of the millions. Eight or nine million? Yes. I just get some sense of what that is. And I could be off by a magnitude. And how about quantity? How much is the quantity they sell? You don't have any idea? Oh, I was talking about – I'm sorry. I thought you were asking about the quantity that they sell. No, about Hokuto, the domestic, the one with the special mushrooms. How much do they sell? That's the $10 million, $20 million. $10 million, $20 million? I think so. I think so. That's quite a range. But what about Koncat then? I'm sorry? And Koncat is the same? They sell $10 million or $20 million? No, no. They're much less. Much less. I don't know why we don't get some quantitative figures. But nobody decided to give them to us. It's nice to have a sense of the magnitudes. You mentioned quality control. Can you respond to the arguments made by Mr. Kindred that there was no quality control and that affected the naked license issue? No. With respect to the Hokuto goods, except for those few white beech mushrooms imported in 2010, they all meet the organic certified standards. And among other things, Hokuto will actually grow the mushrooms in a sterile mulch, a specially prepared mulch. They have robotics that move the actual mushroom containers from one station to another. It's very impressive, actually. I'm sorry? Does organic make a difference? I'll ask you the same question I asked. Absolutely in the United States. It's more expensive to produce, and it's becoming extremely popular among consumers that want to assure that they're eating food that doesn't have a lot of pesticides and herbicides and so forth. So can I ask you something? This is not really in the papers either, but in order for you to put organic on a food label in the United States, does the FDA require certain standards? Does the FDA regulate that at all? Or could someone just put an organic label on something that wasn't manufactured in this sterile environment and with the removal of pesticides? I'm not sure if it's the FDA, but there is a certification standard that needs to be met and a certification board. Is it a federal agency, a state agency? I mean, it has to be federal. I believe so. Because, see, that sort of makes a difference to me. If we know that you have to meet certain standards, sterile standards or state standards to be entitled to label your food organic. I don't know if it's a federal agency or a federally sponsored agency. Okay. But you do need, in order to identify your product as organic, it needs to meet certain standards and be determined that it has met those standards. So the product from the Hokuto Company doesn't meet those standards? Correct. Okay. One question I'm very curious about. This is a gray marketing goods case, right? It's borderline gray market because what we've got in a typical gray market, you would have, say, products being produced in a foreign country coming in, in one stream of importation to, say, a U.S. licensee, and the identical products coming in may be imported by somebody else into the United States, such that the products are identical. Here we've got material differences, so the analysis is really a likelihood of confusion. But it's the same label, right? No. Different labels. The packaging, same trademarks. Same trademarks. Identical trademarks. Okay. Similarities in the packaging, you might call it trade dress, but the content of the packaging, the nutritional information and so forth that's on the packaging is different. And it's in English for Hokuto USA, and it's all Japanese in the product made by Hokuto Japan. Right. When Concord sells it, is it in English? It's also in? It's exactly like they sell it in Japan. Exactly as in Japan. Okay. I just want to follow up on one of the questions that I asked Mr. Kinrod. He said that Hokuto Japan had to be the one watching the quality instead of Hokuto Kaneko. What's your response to that? I think in a licensor-licensee situation with a trademark, there is an obligation on the licensor to monitor the quality control of the licensee's goods. Otherwise, you've got no control over the quality and no control over your own reputation. Here, though, it was Hokuto Japan that developed the system for enabling these products to meet the organic standards. And as a parent-subsidiary relationship, they had monitors in place in the form of, for example, the president of Hokuto Kaneko, Mr. Shigeru, is also a board member of Hokuto Japan. And there was knowledge and standards set up by Hokuto that were being met by Hokuto. That also includes standards for the packaging in English. Can you just address before you run out of time here the allegation of fraud before the trademark office? It appears that Concord is trying to take the one element of what's required to show fraud, which is that there was a misstatement, a false statement. And you conceded that. And bootstrapped that into that being evidence of scienter, of the state of mind of the – In fact, in their reply brief, they kind of rephrase their argument that there's no willful blindness defense to fraud. And, frankly, that doesn't really flow, because willful blindness is a doctrine that would replace evidence of showing actual knowledge that somebody was making a false statement and the intent to deceive. And, in fact, there was a recent Supreme Court case, I'll just mention, Global Tech Appliances, Inc., the SEVSA, that's at 131 Supreme Court 2060 in 2011, which laid out the requirements for willful blindness. And there's two. One is that the defendant must objectively believe that there's a high probability that a fact exists and that the defendant must take deliberate actions to avoid learning of that fact. Well, that's not the scenario we have here. We have, you know, Japanese trademark applications that listed a whole variety of goods sent over to be filed in the U.S. The U.S. attorney relied on the Japanese trademark attorneys and his belief that there was an intent to use for all these goods. And it turns out that there wasn't. And if the injunction is upheld, what's left here? I mean, send it back for what? And then was it a preliminary injunction, permanent injunction? Permanent injunction, Your Honor. What would be left is damages, willful infringement, and actually that would be it. I have one question before we run out of time, which we just did. But counsel, your opposing counsel, argued that Hokuto Konoko admitted that Concord's products were genuine. What's your response to that? That's a mischaracterization. I think there was a statement in a motion to compel that they're citing to. There's a request for admission that I think that Your Honor had alluded to and then some deposition testimony. The only thing that the deposition testimony confirmed was that during a period in 2010, there were these white beach mushrooms that were imported with English labels. I think the request for admission was to admit that the products produced by Hokuto Japan and provided or sold to Noriuchi Produce, Inc., which were then purchased by Concord Farms, are genuine products of Hokuto Japan. And our response was, oh, if, quote, genuine products, end quote, refers to the products produced by Hokuto Japan, then Hokuto Konoko admits this request. They were asking if these came from Hokuto Japan. And we said, yeah. And that's it. It was not a statement that these are genuine products. It was a factual question, a factual admission as opposed to a legal admission. Oh, yes, yes. And the focus of the question was whether or not these were made by Hokuto Japan. Okay. Thank you, counsel. Does anyone have anything further? No? Okay. Thank you. I just wanted to make sure something was clear in the court's mind. I don't think anybody is suggesting that we put organic stickers on non-organic mushrooms. That's not what we did. So I didn't want that to be left in the court's mind. With respect to the naked license, in addition to the quality control issue, we also say there was no consideration for that license. And if you look at the document, there's no stated consideration. When we asked them what was the consideration for that license that Hokuto Japan gave to Hokuto Konoko, they said it was to relieve the Japanese company of the burden of having to administer the trademark portfolio in the United States or something to that effect. But at the time that was done, the owner of the trademark portfolio was Hokuto Japan. And so Hokuto Japan would not be relieved of responsibilities that a foreign trademark owner has in the United States because they would still be obligated from time to time to file ongoing statements of use and renewal statements with the Patent and Trademark Office to keep the registrations alive like the thousands and thousands and thousands of other foreign trademark owners in the United States. So we say that their argument that there was consideration is illusory. And so it is a naked license and it fails and the trademarks go down with it. And then as to the organic, non-organic situation, I just wanted to respond that U.S. consumers are free to purchase either organic or non-organic goods. And in this case, the organic goods made by Hokuto Konoko in the United States are clearly labeled organic. And the consumer would not be confused by that. But that's not the mark. We're not talking about organic as being the trademark that's at issue here. We're talking about the little mushrooms and the way Hokuto is written out with a T and a mushroom. That's what we're talking about. Right. That's the alleged infringement. Right. Well, as of the commencement of this case, those trademarks, the little mushroom characters and the Hokuto mark were all owned by Hokuto Japan and in the United States. So, again, because we purchased goods that were produced by Hokuto Japan, it can't be said that we're infringing. All right. I think we understand. Thank you. Thank you, Your Honor. Thank you very much. Okay. Hokuto Konoko and Hokuto versus Concord Farms will be submitted.
judges: Noonan, Wardlaw, Murguia